UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                              :
ANTONIO ROSARIO,                              :
                                              :     17 Civ. 6602 (VEC)
                          Defendant,          :     09 Cr. 415 (VEC)
                                              :
              v.                              :
                                              :
UNITED STATES OF AMERICA,                     :
                                              :
                          Respondent.         :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANT'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE,
SET ASIDE, OR CORRECT HIS SENTENCE**


                                    JOON H. KIM
                                    Acting United States Attorney for the
                                    Southern District of New York


Margaret Graham
Assistant United States Attorney
*Of Counsel*

## PRELIMINARY STATEMENT

The Government respectfully submits this opposition to the *pro se* motion of Antonio Rosario to vacate, set aside or correct his sentence under Title 28, United States Code, Section 2255 ("Section 2255").  Rosario was convicted after a jury trial of (i) conspiracy to commit Hobbs Act robbery, (ii) substantive Hobbs Act robbery, and (iii) brandishing a firearm during and in relation to a crime of violence, namely, Hobbs Act conspiracy.

Rosario now moves to vacate his sentence, arguing that his counsel was constitutionally ineffective because he failed to raise two arguments.  First, Rosario argues that his conviction on Count Three should be vacated because conspiracy to commit Hobbs Act robbery does not qualify as a "crime of violence" in light of *Johnson v. United States*, 135 S. Ct. 2251 (2015). Second, Rosario argues that the Court violated his due process rights by instructing the jury to "consider each individual charge separately and to evaluate each charge on the evidence or lack thereof."  (Mot. 6).

Rosario's motion should be denied.  Conspiracy to commit Hobbs Act robbery still qualifies as a crime of violence after *Johnson*, and the Court properly instructed the jury to consider each charge separately.

## BACKGROUND

On November 21, 2014, Rosario was convicted after a jury trial of three counts, all related to his December 2008 gunpoint robbery of a pharmacy.  The counts were: (i) conspiracy to commit Hobbs Act robbery, in violation of Title 18, United States Code, Section 1951 ("Count One"); (ii) substantive Hobbs Act robbery and aiding and abetting the same, in violation of Title 18, United States Code, Sections 1951 and 2 ("Count Two"); and (iii) brandishing a firearm during and in relation to a crime of violence, namely, the Hobbs Act conspiracy charged in

2

Count One, and aiding and abetting the same, in violation of Title 18, United States Code,

Sections 924(c)(1)(A)(ii) and 2 ("Count Three").  On April 8, 2015, Your Honor sentenced

Rosario to a within-Guidelines sentence of 96 months' imprisonment on both Counts One and

Two, to run concurrently, followed by the mandatory consecutive term of 84 months'

imprisonment on Count Three.

Rosario appealed his conviction on several grounds, not raised in the instant motion.  The

Second Circuit affirmed Rosario's conviction and issued its mandate on August 11, 2016.  On

August 24, 2017, less than a year after his judgment became final, Rosario filed a Section 2255

motion in the above-captioned case.

## APPLICABLE STATUTES

Section 924(c) criminalizes the use or carrying of a firearm "during and in relation to any

crime of violence" that is itself a violation of federal law. 18 U.S.C. § 924(c)(1)(A). The statute

defines "crime of violence" as an offense that is a felony and either:

> (A) has as an element the use, attempted use, or threatened use of physical force
> against the person or property of another, or
> (B) that by its nature, involves a substantial risk that physical force against the
> person or property of another may be used in the course of committing the
> offense.

18 U.S.C. §§ 924(c)(3)(A), 924(c)(3)(B).

Here, the underlying crime of violence was a Hobbs Act robbery conspiracy. In pertinent

part, the Hobbs Act provides:

> Whoever in any way or degree obstructs, delays or affects commerce or the
> movement of any article or commodity in commerce, by robbery . . . or attempts
> or conspires to do so, or commits or threatens physical violence to any person or
> property in furtherance of a plan or purpose to do anything in violation of this
> section [commits a felony].

18 U.S.C. § 1951(a). The statute defines robbery as:

the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

18 U.S.C. § 1951(b)(1).

The language at issue in *Johnson* was a portion of the Armed Career Criminal Act's ("ACCA") residual clause, which contains language that is similar to § 924(c)'s residual clause, but with important distinctions.  ACCA defines a "violent felony" as, *inter alia*, a crime that:

is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B)(ii).

## ARGUMENT

## I.     Rosario's Arguments Are Procedurally Defaulted

Rosario did not raise any of the arguments in his instant motion in his direct appeal, even though all the arguments were available.[1]  As such, Rosario's arguments are procedurally defaulted.

"Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal."  *Bousley v. United States*, 523 U.S. 614, 621 (1998) (quotation marks and citation omitted); *United States v. Frady*, 456 U.S. 152, 165 (1982) ("[W]e have long and consistently affirmed that a collateral challenge may not do service for an appeal."); *Zhang v. United States*, 506 F.3d 162, 166 (2d Cir. 2007) ("In general, a claim may not be presented in a habeas petition where the petitioner failed to properly raise the claim on direct review.").  Society's interest in

---

[1] *Johnson v. United States*, 135 S. Ct. 2251 (2015), was decided on June 26, 2015, and Rosario filed his appellate brief on August 5, 2015.

repose of criminal judgments animates these procedural rules and compels their vigorous enforcement.  *See, e.g.*, *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *McCleskey v. Zant*, 499 U.S. 467, 490-91 (1991).  As a result, defendants seeking post-conviction relief cannot use a Section 2255 petition to litigate questions that could have been raised on direct appeal but were not.  *See Rosario v. United States*, 164 F.3d 729, 731 (2d Cir. 1999).  A court may consider the merits of a habeas claim that is procedurally defaulted only if (1) the procedural default is excused because there was "'cause'" for failing to raise the claim and resulting "'actual prejudice,'" or (2) the petitioner is "'actually innocent.'"  *Bousley*, 523 U.S. at 622 (quoting, *inter alia*, *Murray v. Carrier*, 477 U.S. 478, 485 (1986), and *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

Here, Rosario seeks to demonstrate both cause and prejudice by arguing that his counsel was constitutionally ineffective for failing to raise the two arguments in the instant motion. (Mot. 5, 6).  Rosario further argues that he is factually innocent of Count Three, the § 924(c) conviction.  (*Id.* at 5).

### A.  *Ineffectiveness of Counsel*

To demonstrate ineffective assistance of counsel, a defendant cannot simply show "[a]ttorney error" in failing to raise an issue on direct appeal.  *McCleskey*, 499 U.S. at 494. Instead, "a petitioner must show that . . . counsel's performance was objectively deficient"— meaning not simply that "counsel 'deviated from best practices or most common custom,' but [that] his 'representation amounted to incompetence under prevailing professional norms.'" *Harrington*, 689 F.3d at 129-30 (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)); *see Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  "The *Strickland* standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder

on that standard." *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001); *see also United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir. 2004) ("A defendant seeking to overturn a conviction on the ground of ineffective assistance of counsel bears a heavy burden.").

If counsel's only asserted failing was neglecting or declining to press a claim that had yet to gain traction in any court at the time of the direct appeal, his representation was not constitutionally ineffective, even if the claim was reasonably available and would, if pressed, not have been frivolous. *See Harrington*, 689 F.3d at 132 (where claim based on new rule of substantive criminal law was being raised by others, but had been "uniformly unsuccessful" at the time of direct review, counsel's decision not to raise it could not "be deemed objectively unreasonable in light of the law as it existed at the relevant time"). Here, the claim that a Hobbs Act conspiracy could not be considered a "crime of violence" under § 924(c)'s force clause, or that § 924(c)'s residual clause was void for vagueness, had yet to gain traction in any court at the time of direct appeal,[2] and Rosario therefore has not shown that his counsel was constitutionally ineffective for failing to raise it on direct appeal.

Further, to show prejudice, Rosario must demonstrate that the allegedly ineffective assistance prejudiced his defense, which means showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome," *id.*, including "the overall integrity of the proceeding,"

---

[2] Indeed, the Ninth Circuit held that 18 U.S.C. § 16(b)'s residual clause, which contains similar language to § 924(c), was void for vagueness in *Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. Oct. 19, 2015), only after Rosario's appellate brief was filed. *Dimaya* is currently on appeal before the Supreme Court.

*Santiago-Diaz v. United States*, 299 F. Supp. 2d 293, 300 (S.D.N.Y. 2004).  For the reasons

discussed below, Rosario cannot show prejudice, because his arguments fail on the merits.

### B.  Actual Innocence

Rosario's claim of actual innocence on Count Three, the § 924(c) conviction, is also

without merit.  "'[A]ctual innocence' means factual innocence, not mere legal insufficiency."

*Bousley*, 523 U.S. at 623 (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)).  This extremely

narrow test is satisfied only if the petitioner can demonstrate that his acts "have been ruled not to

constitute criminal conduct."  *Underwood v. United States*, 166 F.3d 84, 88 (2d Cir. 1999); *see

also Reyes-Requena v. United States*, 243 F.3d 893, 904 (5th Cir. 2001) (petitioner must

establish that he or she "may have been convicted of a nonexistent offense").  To meet this test,

the "petitioner must demonstrate that, in light of all the evidence, it is more likely than not that

no reasonable juror would have convicted him."  *Bousley*, 523 U.S. at 623 (quotation marks and

citation omitted); *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995).

Rosario's claim that he is actually innocent of brandishing a firearm during the robbery of

the Nature's Cure Pharmacy, and aiding and abetting the same, is meritless.  As this Court noted

when denying Rosario's motion for a new trial pursuant to Federal Rule of Criminal Procedure

33, "The Government in this case presented a very strong case that . . . Rosario was the man

inside the drug store brandishing a gun during the course of the robbery," or that at the very least,

he aided and abetted one of his co-conspirators in brandishing a gun during the robbery.  *United

States v. Rosario*, No. 09-Cr-415 (VEC), 2015 WL 518217, at *5 (S.D.N.Y. Feb. 9, 2015).  This

included unequivocal testimony from Rosario's coconspirator, Luana Miller, cell site evidence

from the phones of Rosario and his co-conspirators, and surveillance video.  Given this evidence,

Rosario cannot meet the high burden of showing actual innocence.  *See Herrera v. Collins*, 506

U.S. 390, 404 (1993) (explaining that the actual innocence exception is meant to avoid grave miscarriages of justice—"to see that federal constitutional errors do not result in the incarceration of innocent persons").

## II.    Rosario's Arguments Are Meritless, Because Conspiracy to Commit Hobbs Act Robbery is a "Crime of Violence"

Rosario argues that his conviction on Count Three, for brandishing a firearm in furtherance of a crime of violence, should be vacated because it was predicated on Count One, conspiracy to commit Hobbs Act robbery, which does not qualify as a "crime of violence," as defined by § 924(c).[3]   Rosario cites to the Supreme Court's recent decision in *United States v. Johnson*, which invalidated § 924(e)(2)(B)(ii) of ACCA for being unconstitutionally vague.

Rosario's argument is meritless. The Second Circuit has held that § 924(c)'s residual clause is not void for vagueness under *Johnson*, because it materially differs from the portion of ACCA that was struck down in *Johnson*, and so should not be similarly invalidated.  *See United States v. Hill*, 832 F.3d 135, 146 (2d Cir. 2016);[4] *see also United States v. Eshetu*, 86 F.3d 946, 954 (2017) (holding that § 924(c)'s residual clause is not void for vagueness pursuant to *Johnson*).  In *Hill*, the Second Circuit further held that Hobbs Act robbery qualifies as a "crime of violence" under § 924(c)(3)(A) (the "force clause").  *See id.*  Combined with *United States v. Desena*, which held that a conspiracy to commit a crime of violence is itself a crime of violence for purposes of § 924(c), 287 F.3d 170, 181 (2d Cir. 2002), Second Circuit precedent makes clear that conspiracy to commit Hobbs Act robbery qualifies as a crime of violence under *both* clauses of § 924(c).   Rosario's motion must therefore be denied.

---

[3] This issue is currently before the Second Circuit in *United States v. Barrett*, 14-2641.
[4] A petition for *en banc* review is currently pending in *Hill*.

**A.** ***Section 924(c)(3)(B), the Residual Clause, Is Not Unconstitutionally Vague***

In *Johnson*, the Supreme Court invalidated the "otherwise" portion of ACCA's residual clause, which defines a "violent felony" as any felony that "is burglary, arson or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). The Court found that enhancing punishment under this provision violated due process because it was "so vague that it fail[ed] to give ordinary people fair notice of the conduct it punishes." *Johnson*, 135 S. Ct. at 2556. As explained below, however, *Johnson* does not support a finding that § 924(c)(3)(B) is void for vagueness.

**1.** ***The Supreme Court's Analysis of ACCA in* Johnson**

A combination of factors not present in § 924(c)(3)(B) "conspire[d]" to doom the "otherwise" portion of ACCA's residual clause. *See Johnson*, 135 S. Ct. at 2557. The Supreme Court explained that applying ACCA's residual clause "requires a court to picture the kind of conduct that the crime involves in 'the ordinary case,' and to judge whether that abstraction presents a serious potential risk of physical injury." *Id.* at 2557 (quoting *James v. United States*, 550 U.S. 192, 208 (2007)). But, the Court concluded, the clause features two dimensions of uncertainty—"about how to estimate the risk [of injury] posed by a crime," and "about how much risk" is required under the statute. *Id.* at 2557-58; *see also Hill*, 832 F.3d at 146. Combined, these two uncertainties "produce more unpredictability and arbitrariness than the Due Process Clause tolerates," *Johnson*, 135 S. Ct. at 2558, as evidenced by the widespread disagreement among lower courts and the Court's own "repeated attempts and repeated failures to craft a principled and objective standard," *id.* at 2558-60.

The Court emphasized that its decision did not call into question the validity of many other criminal statutes using similar risk-based terms, including "substantial risk," for two reasons. *Id.* at 2561. First, ACCA's residual clause's risk-based term is linked to a list of exemplar crimes—"burglary, arson, extortion, and crimes involving the use of explosives"—that contributes to both aspects of the statute's indeterminacy. *Id.* at 2557-58; *see also id.* at 2561. "Almost none of the [other] statutes," the Court observed, had a similar feature. *Id.* at 2561. Second, many of the other statutes use the risk-based term in reference to "gauging the riskiness of conduct in which an individual defendant engages on a particular occasion." *Id.* The Court stated that an "abstract inquiry offers significantly less predictability than one that deals with the actual, not with an imaginary condition other than the facts." *Id.* (alteration marks and quotation marks omitted).

### 2.  **Johnson*'s Reasoning Does Not Apply To § 924(c)(3)(B)***

Under anti-vagueness principles, a penal statute must "provide a person of ordinary intelligence fair notice of what is prohibited," and not be "so standard-less that it authorizes or encourages seriously discriminatory enforcement," *United States v. Williams*, 553 U.S. 285, 304 (2008).  But the characteristics of ACCA that the Supreme Court found to violate these requirements are noticeably absent from § 924(c)(3)(B), as the Second Circuit recently held in *Hill*.  832 F.3d at 146.

First, § 924(c)(3)(B) does not have a "confusing" list of exemplar crimes like those preceding ACCA's residual clause. *Johnson*, 135 S. Ct. at 2561.  The difficulties posed by that list pervaded *Johnson*'s analysis.  The listing of burglary and extortion forced courts to "go[ ] beyond evaluating the chances that the physical acts that make up the crime will injure someone." *Id.* at 2557.  And having to assess risk "in light of four enumerated crimes" was a

10

principal reason that "the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony." *Id.* at 2558. By contrast, § 924(c) "contains no mystifying list of offenses and no indeterminate 'otherwise' phraseology." *Hill*, 832 F.3d at 146.

Second, the language of § 924(c)(3)(B) differs in important ways from ACCA. Section 924(c)(3)(B) requires an assessment of the risk of physical force being used in the course of committing the offense. By contrast, ACCA's residual clause directed courts to determine whether a past conviction involved conduct that presented a serious potential risk of physical injury to another. These are not merely semantic distinctions. Section 924(c)(3)(B) unambiguously requires a specific and narrow inquiry regarding the risk that the defendant will use force against the property of another or the person of another in the course of committing the offense. The textual references to the "nature" of the offense and "the course of committing" it, as well as the "use of force," make clear that the focus of the risk assessment is on the offense itself and the defendant's probable actions in committing the crime. *See Eshetu*, 863 F.3d at 955 ("'in the course of' is important narrow language" that "ensures that a court will confine its analysis to the conduct that constitutes the offense."). Nothing in § 924(c)(3)(B) requires a broader risk assessment; unlike ACCA, § 924(c)(3)(B) does not require a prediction as to the consequences of the use of force. This is a "material difference" between the two statutes, and § 924(c)'s language "is both narrower *and* easier to construe." *Hill*, 832 F.3d at 148 (emphasis in original); *accord United States v. Johnson*, No. 14 Cr. 476 (CS) (S.D.N.Y. Dec. 23, 2015) (Ex. A at 21)[5] ("whether a defendant would use force is a much more precise and much less vague inquiry than whether a defendant's conduct will lead to harm against a victim"). ACCA tasked

---

[5] In this case, the Honorable Cathy Seibel, United States District Judge for the Southern District of New York, issued a ruling from the bench, which has not been published in online databases. Accordingly, the Government has included the transcript of Judge Seibel's ruling as Exhibit A.

courts with assessing whether the offense—long ago completed—presented a "serious potential risk of physical injury." As the *Johnson* Court noted, this "seemingly requires the judge to imagine how the idealized ordinary case of the crime subsequently plays out." *Johnson*, 135 S. Ct. at 2557-58. Section 924(c)(3)(B) has no such problem. The question is whether the offense "naturally involve[s] a person acting in disregard of the risk that physical force might be used against another in committing an offense." *Leocal v. Ashcroft*, 543 U.S. 1, 10 (2004) (interpreting identical language in 18 U.S.C. § 16(b)). There is nothing vague or speculative about asking whether an offense "naturally" involves a risk of the use of force during its commission. The phrase "by its nature" in § 924(c)(3)(B) simply triggers application of the categorical approach, which looks at offense elements. *See United States v. Acosta*, 470 F.3d 132, 135 (2d Cir. 2006). "There will not always and necessarily be difficulty or ambiguity in making a categorical assessment whether a particular offense 'by its nature' involves a 'substantial risk'" that physical force may be used in committing it. *United States v. Tsarnaev*, 157 F. Supp. 3d 57, 74 (D. Mass. 2016). Furthermore, the Supreme Court has long examined the "nature" of predicate offenses in applying enhancements. *See, e.g.*, *Moncrieffe v. Holder*, 133 S. Ct. 1678, 1684 (2013).

Because § 924(c)(3)(B) focuses on the perpetrators' "use of force," rather than the potential consequences and effects of the offense, and does not go beyond "the physical acts that make up the crime," *Johnson*, 135 S. Ct. 2557, the statute lacks the key constitutional infirmities that led the Supreme Court to strike down ACCA's residual clause. Moreover, a conviction under § 924(c) requires not only that the defendant commit a crime of violence but also that he use or carry a firearm while doing so, or possess a firearm in furtherance of the offense. The requirement that a firearm be intrinsically related to the crime of violence, coupled with that

statute's focus on the potential use of force and the requirement that the analysis be confined to the commission of the offense, further distinguishes § 924(c)(3)(B) from ACCA.

Third, the Supreme Court has not "repeatedly" failed to construe § 924(c)(3)(B) in a workable way. *See Hill*, 832 F.3d at 148. In *Johnson*, the Court placed great reliance on the repeated appearances of ACCA's residual clause on its docket in the past decade, and how even after all those opinions, confusion still reigned. The Court found that those decisions evidenced "pervasive disagreement about the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider" in applying the residual clause, and "confirm its hopeless indeterminacy." *Id.* No such confusion or "pervasive disagreement" is reflected in the precedent applying § 924(c)'s residual clause.Acts of Congress enjoy a strong presumption of validity. *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963). A court's duty is to construe, rather than to condemn, a statute. *See Skilling v. United States*, 561 U.S. 358, 403 (2010). The Supreme Court was convinced by "[n]ine years' experience," and by multiple prior decisions, that ACCA's residual clause was not susceptible to principled construction. *Johnson*, 135 S. Ct. at 2560. Section 924(c)(3)(B) does not possess the "sum" of factors that led *Johnson* to its conclusion. *Id.*

### 3. *Section 924(c)(3)(B) Is Not Unconstitutionally Vague as Applied to Rosario*

Under vagueness doctrine, "challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis." *United States v. Coppola*, 671 F.3d 220, 235 (2d Cir. 2012) (citation omitted); *see also, e.g.*, *United States v. Williams*, 553 U.S. 285, 304 (2008).

Although the *Johnson* Court entertained a facial challenge to ACCA, it did so in the context of a statute exhibiting an inherent inability to produce "even-handed, predictable, or

consistent" applications.  *Johnson*, 135 S. Ct. at 2563.  Absent unusual circumstances of the type

present in *Johnson*, as-applied review is preferred because "a person to whom a statute may

constitutionally be applied will not be heard to challenge that statute on the ground that it may

conceivably be applied unconstitutionally to others, in other situations not before the Court."

*United States v. Farhane*, 634 F.3d 127, 138 (2d Cir. 2011) (citation omitted).  This approach is

consistent with the principle that "as between two possible interpretations of a statute, by one of

which it would be unconstitutional and by the other valid, a court's plain duty is to adopt that

which will save the Act enacted by Congress."  *Id.* (internal citation and quotation marks

omitted).  *Johnson* did not purport to overrule the Supreme Court's numerous cases requiring a

court to analyze a vagueness challenge outside of the First Amendment context on the facts of

the particular case before it.  *See, e.g.*, *Chapman v. United States*, 500 U.S. 453, 467 (1991);

*United States v. Powell*, 423 U.S. 87, 92 (1975); *United States v. Mazurie*, 419 U.S. 544, 550

(1975).  "[N]othing in *Johnson* altered the well-settled rule in this Circuit that such challenges

should first be reviewed as-applied to the objecting Defendant."  *United States v. Doe*, 2015 WL

7422618, at *7 (E.D.N.Y. Oct. 29, 2015) (requiring as-applied challenge to § 16(b) even post-

*Johnson*, and finding no vagueness where predicate offense was providing material support to a

terrorist organization); (*Johnson*, Ex. A at 18 ("notwithstanding the approach taken in *Johnson*, I

do think the proper way to consider the matter here is as-applied, which is . . . how the Court has

always said it should be done except in the First Amendment context")); *Tsarnaev*, 157 F. Supp.

3d at 74 n.21 ("Section 924(c) operates necessarily in an 'as-applied' context" so that

"consulting the specific allegations of the indictment is unavoidable").

　　　　　Further, *Johnson* did not hold that any possibility of a vague application requires finding

a statute void for vagueness.  Rather, it concluded that the residual clause was void for vagueness

because it was a "judicial morass that defies systemic solution, a black hole of confusion and uncertainty that frustrates any effort to import some sense of order and direction." *Johnson*, 135 S. Ct. at 2562 (citation and quotation marks omitted).  But "there are [other] statutes that by their terms or as authoritatively construed apply without question to certain activities, but whose application to other behavior is uncertain." *Smith v. Goguen*, 415 U.S. 566, 577-78 (1974).  For those statutes, the general rule is that a vagueness challenge is not available to one who violates the "hard-core" of the statute.  *Id.*  Facial vagueness challenges should therefore be reserved for statutes that "simply ha[ve] no core," "in the sense that no standard of conduct is specified at all."  *Id.* (citation and quotation marks omitted).

Section 924(c)(3)(B) is clearly not a statute that "simply has no core."  *See Leocal*, 543 U.S. at 10 (describing burglary as a "classic example" of a "crime of violence" pursuant to the residual clause of 18 U.S.C. § 16(b), which is identical to the residual clause of  Section 924(c)(3)(B), because, "by its nature, [burglary] involves a substantial risk that the burglar will use force against a victim in completing the crime"). For years, courts have had little difficulty identifying crimes involving a "substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

Rosario was convicted of committing a robbery by brandishing a firearm—conduct that, even more so than burglary, falls well within the "core" of § 924(c)(3)(B) and "involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  *See United States v. Acosta*, 470 F.3d at 136-37 ("Since applying physical force is perhaps the most obvious way to injure, threaten, or intimidate, a conspiracy to engage in such conduct is, by its nature, a conspiracy that involves a 'substantial risk that physical force' will be used").  Indeed, as one district court in this Circuit has held in

15

connection with racketeering charges, "if it's as-applied, it's easy" because "there can't be any notice problem where the object of the offense has force as an element and a firearm is allegedly used in connection with it." (*Johnson*, Ex. A at 18).  The to-wit clause and overt acts of the Hobbs Act conspiracy count further ensure that, as applied to Rosario, the conspiracy with which he was charged undoubtedly involved the use of force.

### B.  *Hobbs Act Robbery Conspiracy is a Crime of Violence Under § 924(c)(3)(A)*

It has long been settled in this Circuit that a conspiracy to commit a crime of violence is itself a crime of violence for purposes of § 924(c).  *See, e.g.*, *United States v. Desena*, 287 F.3d 170, 181 (2d Cir. 2002) ("a conspiracy to commit a crime of violence is a sufficient predicate crime of violence for the purposes of 18 U.S.C. § 924(c)") (internal quotation omitted).  Nearly two decades ago, the Second Circuit ruled that "a Hobbs Act conspiracy to commit robbery is by definition a conspiracy that involves a substantial risk that physical force may be used against the person or property of another."  *United States v. Elder*, 88 F.3d 127, 129 (2d Cir. 1996); *see also Eshetu*, 863 F.3d at 955-56 (holding that conspiracy to commit Hobbs Act robbery is a "crime of violence" under § 924(c)'s residual clause).  Because such a conspiracy falls squarely within the ambit of § 924(c)'s residual clause, the Second Circuit has not yet considered whether it also falls within the force clause.  If this Court finds it necessary to reach this issue, the conspiracy's threat of force, which the agreement itself creates, satisfies the force clause.[6]  *See United States v. McLean*, ___ F.3d ___ (3d Cir. Aug 3, 2017) (holding that conviction for conspiracy to commit Hobbs Act robbery is crime of violence under § 924(c)'s force clause).

---

[6] However, in *Hill*, 832 F.3d at 140, the Second Circuit cited approvingly the holding of *United States v. DiSomma*, that "conspiracy to commit robbery is a crime of violence because one of its elements is actual or threatened use of force," analyzing the identical language of the Bail Reform Act, 951 F.2d 494, 496 (2d Cir. 1991).

To fall within the force clause, conspiracy to commit robbery must have, as an element, the "use, attempted use, or threatened use of physical force."  Because the conspiracy prohibition is embedded within § 1951, even under a categorical approach one element of the conspiracy offense is, by definition, an agreement between the conspirators to commit the crime of robbery, that is, to take property from someone by force.  This agreement "threatens" the use of force.

One definition of "threaten" is "to give signs or warning of," or "to portend."  Webster's Ninth New Collegiate Dictionary 1229 (1991).  When two or more people share the specific intent to commit a robbery—that is, to take something from a person by force—that agreement, without more, "portends" the use of force, because the existence of the conspiracy makes the occurrence of the conspiracy's object far more likely.  As a result, the robbery conspiracy includes, as an element, the threatened use of force, and thereby qualifies as a "crime of violence" under the force clause.

This construction is entirely consistent with Congress's intent in defining a "crime of violence."  Courts have long recognized that conspiracies to commit substantive offenses pose as great, or greater, dangers to society as the substantive offenses themselves.  After all, "collective criminal agreement—partnership in crime—presents a greater potential threat to the public than individual delicts.  Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality."  *Iannelli v. United States*, 420 U.S. 770, 778 (1975) (quoting *Callanan v. United States*, 364 U.S. 587, 593 (1961)); *see also, e.g.*, *United States v. Patino*, 962 F.2d 263, 267 (2d Cir. 1992) ("Such a meeting of the minds enhances the likelihood that the planned crime will be carried out.").

17

**III.     The Court Correctly Instructed the Jury to Consider Each Charge Separately**

Rosario's second argument is somewhat unclear.  He writes:

> My due process rights were violated when the court instructed the jury to consider each individual charge separately and to evaluate each charge on the evidence or lack thereof.  The court instructed the jury to consider the 924(c) charge "only if they first found me guilty on Count On [sic] Hobbs Act Conspiracy a crime of violence which is not.  The jury instruction as flawd [sic] because Count 2 Hobbs Act Robbery could not have been considered and evaluated separately without Counts One and Count Two.

(Mot. 6).

Because the Court must construe a *pro se* motion's claims liberally, the Government considers several possible interpretations of Rosario's second argument.  First, the argument that Rosario's due process rights were violated by the Court's instruction to consider each charge separately has no merit.  Juries are routinely instructed to consider each individual charge separately – indeed, it is considered a necessary charge to prevent spillover prejudice when a jury is considering multiple counts.  *See, e.g.*, *United States v. Rivera*, 546 F.3d 245, 254 (2d Cir. 2008) (noting approvingly that "the District Court instructed the jury to 'consider each count separately and return a separate verdict of guilty or not guilty for each' of them"); *see also United States v. Morales*, 185 F.3d 74, 83 (2d Cir. 1999) (same).

Second, if Rosario is instead arguing that the three counts in the Indictment should have been severed, this argument is also without merit.  Counts One through Three were all properly joined at trial because they were "based on the same act or transaction," and were "connected with" and "constitute[d] parts of a common scheme or plan."  Fed. R. Crim. P. 8(a).  They all charged Rosario with participated in the armed robbery of Nature's Cure Pharmacy in midtown Manhattan on December 24, 2008.  They charged him with conspiring to do so, actually doing so, and brandishing a firearm while doing so.  These counts were inextricably intertwined, and

were properly joined.  *See, e.g.*, *United States v. Lee*, 549 F.3d 84, 94–95 (2d Cir. 2008)

(affirming joinder of murder for hire conspiracy and felon in possession counts, where gun was

"both an instrumentality of the murder for hire conspiracy and the basis for the felon-in-

possession charge").

Third, if Rosario is restating his argument that Count One is not a crime of violence post-

*Johnson*, this argument fails for the reasons stated in Section I of this brief.

## CONCLUSION

For the foregoing reasons, the Rosario's Section 2255 motion should be denied in its

entirety.  Because Rosario has not made a substantial showing of the denial of a constitutional

right, no certificate of appealability should issue.

Dated:  New York, New York
        November 27, 2017

Respectfully submitted,

JOON H. KIM
Acting United States Attorney

By:   _/s/_____
      Margaret Graham
      Assistant United States Attorney
      (212) 637-2923

# EXHIBIT A

Add. 1

**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
UNITED STATES OF AMERICA

                    v.                    14 CR. 476 (CS)

DA'QUAN JOHNSON, JAMES JOHNSON,
**DARIN FIELDS, ANTHONY FORD,**
**RONNIE KING, JAMES MCCALLUM,**
**WILBUR RANDOLPH,**

                    Defendants.
-----------------------------------x

                              U.S. Courthouse
                              White Plains, N.Y.
                              December 23, 2015
                              3:00 p.m.


Before:   HON. CATHY SEIBEL,
          **United States District Judge**



APPEARANCES

PREET BHARARA
**United States Attorney**
**Southern District of New York**
**300 Quarropas Street**
**White Plains, N.Y.  10601**
BY:  DOUGLAS ZOLKIND
     **SCOTT HARTMAN**
**Assistant United States Attorneys**

RUSSELL NEUFELD, Esq.
**Attorneys for Da'Quan Johnson**

JAMES DEVITA, Esq.
Attorney for James Johnson

ERIC CREIZMAN, Esq.
Attorney for Darin Fields

Richard Willstatter, Esq.
Attorney for Anthony Ford

John Wallenstein, Esq.
Attorney for James McCallum

JAMES ROTH, Esq.
Attorney for Wilbur Randolph

Sue

Add. 3

3

```
 1              THE CLERK:  United States against Johnson, et al.
 2              THE COURT:  Have a seat everyone.
 3              All right.  Let's see.  As I understand it, Mr.
 4    Brown, Mr. Couch and Mr. Grebinger are not with us; is that
 5    correct?
 6              MR. ZOLKIND:  That's correct, Your Honor.  I have
 7    communicated with their counsel, all of whom waive their
 8    client's appearances at today's conference.
 9              THE COURT:  All right.  That leaves -- let's see,
10    Mr. Neufeld and Mr. Johnson, you are way down there.
11              MR. NEUFELD:  Yes.  Good afternoon, Your Honor.
12              THE COURT:  Good afternoon.  And then Mr. DeVita and
13    Mr. James Johnson, good afternoon.
14              MR. DeVITA:  Yes, Your Honor, we are both here.
15              THE COURT:  Good afternoon.
16              MR. DEVITA:  Good afternoon.
17              THE COURT:  Mr. Creizman and Mr. Fields, good
18    afternoon.
19              MR. CREIZMAN:  Good afternoon, Your Honor.
20              THE COURT:  Mr. Willstatter and Mr. Ford, good
21    afternoon.
22              MR. WILLSTATTER:  Good afternoon.
23              THE COURT:  Mr. King is here without Mr. Handelman,
24    but Mr. Neufeld, you are pinch-hitting?
25              MR. NEUFELD:  Yes, Your Honor, I am.
```

Sue Ghorayeb,  Official Court Reporter

Add. 4

4

```
1              THE COURT:  All right.  Good afternoon, Mr. King.
2              DEFT. KING:  Good afternoon.
3              THE COURT:  Mr. Wallenstein and Mr. McCallum.
4              MR. WALLENSTEIN:  Yes, Your Honor.  Good afternoon.
5              THE COURT:  Good afternoon.  And that must leave
6  Mr. Roth and Mr. Randolph.
7              MR. ROTH:  Yes, Your Honor.  Good afternoon, Your
8  Honor.
9              THE DEFENDANT:  Good afternoon.
10             THE COURT:  Good afternoon.
11             Okay.  Let me start by putting on the record what I
12  have, because things have been flying and I just want to make
13  sure I have everything.
14             First is Mr. Ford's motion to dismiss Count Two.
15             Then I have letters from counsel for Mr. Randolph,
16  Da'Quan Johnson, James McCallum, Daquan Couch, and James
17  Johnson and Ronnie King, all asking to join.
18             Then I have the Government's Memorandum of Law in
19  opposition.  I have Mr. Ford's reply Memorandum of Law.  I
20  have the Government's December 20th letter.
21             I have Mr. Willstatter's December 23rd letter, and I
22  just got a copy of the Edmundson case, which was referred to
23  in Mr. Willstatter's most recent letter.
24             Is that everything?
25             MR. ZOLKIND:  Your Honor, we also submitted a letter
```

Sue Ghorayeb,  Official Court Reporter

Add. 5

5

1   about an hour or so ago, in response to Mr. Willstatter's

2   letter, from earlier today, Your Honor.

3          THE COURT:  That one I haven't seen.  Do you have a

4   copy of it?

5          MR. ZOLKIND:  I do.

6          THE COURT:  If you submitted it by ECF, next time --

7          MR. ZOLKIND:  I think we brought it up as well, but

8   if we didn't, I apologize.

9          THE COURT:  Well, I mean, you may well have, and

10  it's probably sitting on the pile of mail that I haven't

11  looked at yet.  Just don't be shy about giving chambers a ring

12  to tell me I need to look at something right away.

13         MR. ZOLKIND:  Okay.  Thank you, Your Honor.

14         THE COURT:  That goes for everybody.

15         Let me give a quick read to this last letter.

16         Okay.  All right.  I have everything I guess.

17         I'll now hear whatever anybody wants to argue.

18         Mr. Willstatter, it's your motion, so I'm happy to

19  hear whatever you like.  You can come down here if you like.

20  The court reporter might appreciate it.

21         MR. WILLSTATTER:  Your Honor, recently, the Seventh

22  Circuit weighed in on the issue of the constitutional

23  infirmity of Title 18 Section 16(b) in a way that is

24  consistent with the decision of the Ninth Circuit in the

25  Dimaya case.

                    Sue Ghorayeb,  Official Court Reporter

Add. 6

6

1              THE COURT:  Just one second, Mr. Willstatter.

2              I'm sorry, but that young person who is making the

3    noise needs to step out.  Thank you.

4              MR. WILLSTATTER:  Dimaya is spelled D-i-m-a-y-a.

5    Those cases --

6              THE COURT:  The Seventh Circuit came in in the nick

7    of time, because, you know, the Ninth Circuit doesn't really

8    bring that much here.

9              MR. WILLSTATTER:  I personally like Judge Reinhardt

10   a lot.

11             THE COURT:  The record should reflect I was just

12   kidding.

13             MR. WILLSTATTER:  Right.  But the Seventh Circuit

14   has agreed with the Ninth Circuit.  And, then, today I

15   received a decision which -- just received while we were

16   waiting for the Court to walk out of chambers, in the

17   Edmundson case, by a Judge Paul Grimm, essentially agreeing

18   with the Ninth Circuit and applying it to Title 18, Section

19   924(c)(3)(B).

20             I don't think that I can articulate the arguments

21   any better than was done by Judge Grimm and by the Seventh and

22   Ninth Circuits.  I think that it is clear that a conspiracy,

23   no matter what the object of the conspiracy is, cannot qualify

24   under the force clause.

25             THE COURT:  Let me just interrupt you to ask if the

                   Sue Ghorayeb,  Official Court Reporter

Add. 7

1  Government disagrees with that.  I didn't understand them to

2  be arguing that conspiracy has, as an element, the use,

3  threatened use, blah blah blah.

4          Are you --

5          MR. ZOLKIND:  That's correct.

6          THE COURT:  Are you arguing the force clause here?

7          MR. ZOLKIND:  We're not, Your Honor.

8          THE COURT:  Okay.

9          MR. ZOLKIND:  We think the conspiracy fits into the

10  residual clause.

11          THE COURT:  Okay.  That's what I thought.  All

12  right.

13          MR. WILLSTATTER:  So --

14          THE COURT:  So, we're all on the same page.

15          MR. WILLSTATTER:  Right.  So, narrowing the issue

16  then, it's really a question of whether the residual clause is

17  unconstitutionally vague, and I think the parties have

18  admirably addressed this point and presented the arguments to

19  the Court.  So, I don't think it's necessary for me to repeat

20  them unless the Court has questions.

21          THE COURT:  I have a couple of questions, but I

22  guess they are really for the Government.  But stay there in

23  case, in case I turn back to you.

24          You are urging me to look at the residual clause

25  as-applied, which, were it not for Johnson, would make a lot

Sue Ghorayeb,  Official Court Reporter

Add. 8

8

1   of sense, but the Supreme Court in Johnson didn't do it that
2   way, and Alito's dissent I thought pointed out quite cogently
3   why that was wrong, and if I was on the Supreme Court, I would
4   have voted with him, but he was in the minority.
5            So, how do I look at this as-applied when the
6   Supreme Court didn't do that in Johnson?
7            MR. ZOLKIND:  I think the answer, Your Honor, lies
8   in -- well, I'll say this.  Scalia did not say in response to
9   Alito's dissent that that's the wrong analysis.  He didn't say
10  that it's now the case that vagueness challenges can be
11  brought on a facial matter even outside the First Amendment
12  context.  So, I think the fact that Scalia didn't say that
13  indicates that that is still the rule of law that generally
14  applies.
15           THE COURT:  But he didn't do it.
16           MR. ZOLKIND:  Right.  In this case, I think, I think
17  the answer for why Scalia -- Justice Scalia did not do that in
18  Johnson is because of all the problems that, that Justice
19  Scalia saw with the ACCA residual clause and the fact that
20  those problems have been brought up by him in dissents, and by
21  other members of the court, in multiple prior opinions, and,
22  so, there had been repeated efforts by the court to interpret
23  ACCA's residual clause.  And, so, I think it was not a first
24  time one-off situation where the clause was being looked at
25  the first time there.

                  Sue Ghorayeb,  Official Court Reporter

Add. 9

9

```
 1              THE COURT:  Well, what does that have to do with
 2    whether he --
 3              MR. ZOLKIND:  Well, I think --
 4              THE COURT:  -- whether he overlooks all of the cases
 5    that say outside the First Amendment context --
 6              MR. ZOLKIND:  Right.
 7              THE COURT:  -- you do it as-applied?
 8              MR. ZOLKIND:  I think the answer is just that, in
 9    Justice Scalia's view, ACCA's residual clause was so vague for
10    the combination of reasons that were unique, we would submit,
11    unique to that clause and not, not as applicable to Section
12    924(c)'s clause, that I think just given the combination of
13    those factors with respect to ACCA, Justice Scalia was of the
14    view that it is vague in all of its applications and I think
15    in, in his view, even if there, you know, even if there was
16    hypothetically a situation where it could be not vague as
17    applied in a particular case, I think in Justice Scalia's view
18    the overwhelming number of cases applying ACCA's residual
19    clause would be vague.
20              I think the distinctions with the 924(c) clause are
21    significant, and one of them is that, you know, even if it is
22    hypothetically possible that 924(c)'s or Section 16's residual
23    clause might be vague in a hypothetical case, I think it's
24    different enough from ACCA that it makes sense to analyze it
25    the way Judge Brodie did in the Eastern District, which is to
```

Sue Ghorayeb,  Official Court Reporter

Add. 10

1    say, "we're going to analyze this statute for vagueness in the

2    same way that we analyze any statute for vagueness outside of

3    the First Amendment context," which is by looking at the

4    context in this particular case.

5             THE COURT:  Mr. Willstatter, are you arguing that

6    the residual clause is vague as applied to your client or just

7    facially?

8             MR. WILLSTATTER:  That it's facially invalid.  And

9    on Page 12 or, actually, it's Page 10 of my reply brief, I

10   quoted Justice Scalia where he wrote, "It seems to us that the

11   dissent's supposed requirement of vagueness in all

12   applications is not a requirement at all, but a tautology:  If

13   we hold a statute" --

14            THE COURT:  Tautology.

15            MR. WILLSTATTER:  Tautology.  I guess I pronounced

16   that incorrectly, a tautology.  "If we hold a statute to be

17   vague, it is vague in all its applications (and never mind the

18   reality)."  In other words, I'm saying, a law may be

19   unconstitutionally vague without reference to the particular

20   allegations the government wishes to prosecute or to use to

21   prosecute the matter.

22            So, we think that the Supreme Court of the United

23   States has directly addressed this.  And the most recent

24   opinion from Judge Grimm points out that there are several

25   statutes that he points to where real world force is

                 Sue Ghorayeb,  Official Court Reporter

Add. 11

1   specifically in the statute and can -- is part of the statute,

2   as opposed to 924(c)(3)(B), which is unconstitutionally vague.

3            THE COURT:  Well, it is interesting.  Alito does --

4   I mean Scalia does address Alito's point, but if he were

5   really intending to overrule this long line of cases that say

6   outside the First Amendment context you look as-applied, I

7   think he would have come out and said it.

8            MR. WILLSTATTER:  Well, sometimes they don't need to

9   say anything except to deal directly with the case itself.

10           THE COURT:  This is true, this is true.

11           Let me ask you another question and I don't know

12  which of you it's for.

13           Is this conversation we're having not -- rather

14  academic, because the racketeering conspiracy also has drug

15  predicates, and if I grant your motion, they are just going to

16  go back and bring the same 924(c) and peg it off a drug

17  trafficking crime instead of a crime of violence?

18           MR. WILLSTATTER:  Maybe they can't, and maybe they

19  can't prove a drug conspiracy as to particular Defendants.

20           THE COURT:  Maybe they can't prove a drug conspiracy

21  as to --

22           MR. WILLSTATTER:  I don't know.  Maybe they can and

23  maybe they can't.  In other words, they could charge another

24  crime and, then, then the Court would have to rule on a

25  motion, if one was brought, depending on what -- and maybe we

Sue Ghorayeb,  Official Court Reporter

Add. 12

1    wouldn't be able to bring a motion if they brought another

2    kind of an indictment, but the only thing the Court can rule

3    on is the Indictment.

4              THE COURT:  Well, I'm going to rule on it.  I'm just

5    wondering if it's going to be academic --

6              MR. ZOLKIND:  Your Honor.

7              THE COURT:  -- because the RICO already has drug

8    predicates in it.  I'm not sure, and they don't have to tell

9    me why they didn't -- they referred only to a crime of

10   violence in Count Two.  Maybe they had their reasons.  Maybe

11   they don't have evidence that there were guns used apart from

12   the acts of violence.  I don't know.

13             MR. WILLSTATTER:  Notably, Mr. Ford, for example, is

14   not charged in the drug conspiracy.

15             MR. ZOLKIND:  Your Honor, I think the Court is

16   correct in suggesting that, that we can supersede with -- I

17   mean, as the drug conspiracy is charged right now, not every

18   Defendant is charged in it, and we do believe -- we've gone

19   back since the initial Indictment was returned.  We have

20   looked at the proof.  We do think we can charge that with

21   respect to all of the Defendants who remain in the case, but I

22   don't think that makes the question academic.

23             And I'll just note, I think our view is, we can also

24   charge substantive RICOs and vicars against many, if not all,

25   of the remaining Defendants and we plan to.  And, so, I think

Sue Ghorayeb,  Official Court Reporter

Add. 13

```
 1   using those crimes as predicates for 924(c) also would not, in
 2   our view, implicate the residual clause.  But all of that
 3   said, we don't think this issue is academic.  You know, the
 4   proof on these different charges is different.  One never
 5   knows how the jury is going to, going to find any particular
 6   count.  So -- so, I think --
 7            THE COURT:  No.  Yes, you're right.  Both of you are
 8   right.  I guess I don't mean academic in the sense of
 9   pointless.  I guess maybe I mean, just as a practical matter,
10   it may or may not make a difference in the long-run.
11            MR. ZOLKIND:  Your Honor, if I can just add one
12   point with respect to the --
13            THE COURT:  Yes.
14            MR. ZOLKIND:  -- question you asked just a moment
15   ago about the as-applied versus facial challenge.
16            I just want to -- the Government has cited to Judge
17   Brodie's decision in the Eastern District, and I think one
18   aspect of her decision is important on this point.  In that,
19   in that case, when she was explaining why she analyzed it
20   as-applied rather than facially, the court noted, "This
21   preference for an as-applied challenge is routed in a concern
22   with preserving the separation of powers and exercising
23   judicial restraint as it serves the juris prudential maxim
24   that as between two possible interpretations of a statute, one
25   by which should be" -- constitutional and by the other -- and
```

Sue Ghorayeb,  Official Court Reporter

Add. 14

1   by the other valid -- "unconstitutional and by the other

2   valid, the court's plain duty is to adopt that which will save

3   the Act enacted by Congress."

4           And, so, I just think the preference for as-applied

5   challenges is not only the rule of law, as the Second Circuit

6   has said, in applying the Supreme Court case law, but it also,

7   it also makes sense given the, you know, the preference for

8   upholding acts of Congress rather than finding them

9   unconstitutional when there is a basis to do so.

10          And I think the reason that Justice Scalia didn't

11  say that that's no longer the way it's done and the reason

12  that he looked at ACCA facially has to do much more with the

13  unique fact that ACCA had been before the Court many times,

14  the Court had tried to narrow and interpret the statute and

15  had simply been unable to do so.  That's just not the case

16  with respect to 924(c).

17          THE COURT:  Right.  Although the Seventh Circuit and

18  I think the Maryland Judge in Edmundson both pointed out that,

19  you know, those were sort of second tier arguments that

20  weren't really necessary to the holding in Johnson.

21          What makes you think that either that argument or

22  the confusing enumerated list arguments, that those factors,

23  if they were gone, would have had Johnson go the other way?

24          MR. ZOLKIND:  Right.  And I think there is a

25  separate question whether or not the residual clause is

Sue Ghorayeb,  Official Court Reporter

Add. 15

1   unconstitutionally vague as applied or facially, and I think

2   there are important distinctions between 924(c)'s clause and

3   ACCA's clause.  We have addressed them and I'm certainly happy

4   to answer any questions.

5          I think the point I was making about the fact that

6   the case had come up to the Supreme Court many times, that the

7   Court had tried to limit it, and at least in Justice Scalia's

8   view had failed to do so, I think that really helps to explain

9   why the Court looked at it facially rather than adopting the

10   traditional route of, of an as-applied challenge.

11          THE COURT:  I see what you're saying.

12          MR. WILLSTATTER:  Just in response to that, if the

13   Court will hear me.

14          THE COURT:  Yes.

15          MR. WILLSTATTER:  The problem is the ordinary case

16   language, you know.  The statute says, "by its nature."  We're

17   talking about the nature of the felony, and that is the

18   essential problem and the similarity between the residual

19   clause in ACCA and 924(c)'s residual clause.  They both have

20   the same essential problem, and this problem was identified by

21   the Ninth Circuit, by the Seventh Circuit, certainly by Judge

22   Grimm.

23          You know, this is the problem that was addressed, in

24   essence, when, you know, Judge Scalia wrote, more importantly,

25   that, you know, that is the problem with this, with the ACCA

Sue Ghorayeb,  Official Court Reporter

Add. 16

1  statute.  It may be that they had revisited this statute so

2  many times and realized that it couldn't be salvaged, but that

3  doesn't mean that other statutes are just dandy because the

4  Supreme Court hadn't dealt with them.

5       MR. ZOLKIND:  Well, but the Supreme Court has dealt.

6  I mean, in the decision of Leocal, which we cite in our brief,

7  the Supreme Court interpreted Section 16, which as we've

8  discussed has identical language to Section 924(c) and the

9  Supreme Court said, among other things, "This statute covers

10  offenses that naturally involve a person acting in disregard

11  of the fact that physical force might be used against another

12  in committing an offense."

13       So, the Supreme Court has interpreted the language

14  at least from Section 924(c) and no one on the Court in that

15  case raised concerns of that being unconstitutionally vague,

16  and I think that's because —— well, as we've pointed out,

17  there are several critical differences between the language in

18  Section 16 and 924(c) and the language in ACCA.

19       Mr. Willstatter is right that they both involve a

20  sort of ordinary case analysis, but the type of ordinary case

21  analysis is very different, and that goes to, I think most

22  critically, the fact that in —— with respect to the ACCA

23  residual clause, courts need to evaluate the risk of the

24  offense actually resulting in physical injury, which is just

25  inherently much more speculative than looking at whether an

Sue Ghorayeb,  Official Court Reporter

Add. 17

1   offense naturally involves a risk of physical force being

2   used.  That is, I think, a critical difference and is one of

3   the main things that the Supreme Court focussed on when

4   striking down that language.

5          I mean, one I think important quote from the Johnson

6   opinion is Justice Scalia said, "critically, picturing the

7   criminal's behavior is not enough."  That is enough when it

8   comes to 924(c).

9          And he said, "As we have already discussed,

10  assessing potential risk in the ACCA context requires judges

11  to imagine how the idealized ordinary case of the crime

12  subsequently plays out," and that is not at issue in, in the

13  Section 924(c) residual clause, and so that's -- I think

14  that's a critical distinction and one that the Seventh Circuit

15  just seemingly ignored or didn't focus on.  I mean it's

16  just -- it was not part of that Court's analysis so far as we

17  can tell, and I think it should be.  I think it's important

18  and it's notable that Judge Brodie I think focussed on that

19  quite a bit.

20         THE COURT:  All right.  Any last words?

21         MR. WILLSTATTER:  No.  Thank you.

22         THE COURT:  All right.  Look, this is, this is a

23  difficult question.  Obviously, the courts are all over the

24  place on it.  I guess I'm the first in our District to have to

25  cross this bridge, but I'm sure the Circuit will set us

Sue Ghorayeb,  Official Court Reporter

Add. 18

1  straight soon, not soon enough for this case.  And it's a

2  close call, but I think I come out on the Government's side

3  for two reasons:

4          First of all, I think notwithstanding the approach

5  taken in Johnson, I do think the proper way to consider the

6  matter here is as-applied, which is, you know, how the Court

7  has always said it should be done except in the First

8  Amendment context.

9          As I said before, I think Alito's dissent in Johnson

10  had the better of the argument and I don't think the majority

11  really had a good response; Scalia kind of gave it the back of

12  the hand, and I think if the majority really intended to

13  depart from its long-standing precedents on that subject, it

14  would have said something more about it.

15          And the -- I believe it was the dissent in Dimaya --

16  no.  Maybe I'm wrong.  Withdrawn.

17          Judge Brodie in her case makes -- and for the record

18  her case is Doe, 2015 Westlaw 7422618, from October 29th, I

19  think she makes the case for why it should be as-applied, and

20  if it's as-applied, it's easy.  The Defendants don't even

21  argue that an as-applied challenge should succeed here.  And I

22  agree with the Government that there can't be any notice

23  problem where the object of the offense has force as an

24  element and a firearm is allegedly used in connection with it.

25          So, I don't think any defendant charged with

Sue Ghorayeb,  Official Court Reporter

Add. 19

1    conspiring to commit racketeering through a pattern of

2    racketeering activity that includes murder and attempted

3    murder could fail to be on notice that that will be a crime of

4    violence, and to have used a firearm in furtherance of it,

5    could fail to be on notice that he would be subject to 924(c).

6          If I'm wrong about that, then I would have to face

7    the -- if I'm wrong about the looking at it as-applied, then

8    we have a much thornier question.  I still ultimately come out

9    that Johnson doesn't govern here for the following reasons:

10         And, first, the background:  Count Two charges the

11   use, carrying, possession of the firearm in connection with a

12   crime of violence, in violation of 924(c)(1)(A).  The charged

13   crime of violence is the RICO conspiracy charged in Count One.

14         924(c)(3) defines a "crime of violence" as a felony

15   that either "(A) has as an element the use, attempted use, or

16   threatened use of physical force against the person or

17   property of another" or "(B) by its nature involves a

18   substantial risk that physical force against the person or

19   property of another may be used in the course of committing

20   the offense."  (A) is known as the force prong and (B) is

21   known as the residual prong.

22         We all agree that Count One doesn't fall under

23   Subsection A, but the Government argues it meets the

24   definition in Subsection B.

25         The Defendant argues that the Government can't rely

                    Sue Ghorayeb,  Official Court Reporter

Add. 20

1   on (B), because it is void for vagueness pursuant to the

2   Supreme Court's decision in Johnson, 135 S. Court 939.

3           In Johnson, the Court found a different provision to

4   be void for vagueness, specifically, the definition of violent

5   felony in the Armed Career Criminal Act, which is in 18 U.S.

6   Code 924(e)(2)(B)(ii).  That section says, "A violent felony

7   is burglary, arson or extortion, involves the use of

8   explosives or otherwise involves conduct that presents a

9   serious potential risk of physical injury to another."

10          I won't summarize the reasoning in Johnson.  We're

11  all familiar with it.

12          The Defendant argues that if 924(e)(2)(B)(ii) in

13  Johnson is too vague, then 924(c)(3)(B) must also be too

14  vague.  A number of District Courts have rejected this

15  argument; if not in the context of 924(c)(3)(B), then in the

16  context of 18 U.S. Code 16(b)'s definition of crime of

17  violence, which is in all material respects identical to

18  924(c)(3)(B), but the Defendants have the Ninth and Seventh

19  Circuits on their side.

20          I actually found the dissent in Dimaya to be more

21  persuasive.  And although the Seventh Circuit decision gave me

22  more pause than Dimaya, I still think I come out differently

23  for a number of reasons:

24          First, the Government argues that this case is

25  different from Johnson, because 924(c)(3)(B) focuses on the

Sue Ghorayeb,  Official Court Reporter

Add. 21

1    defendant's  conduct during the offense, not on potentially

2    remote consequences to third-parties.  In other words, it

3    looks just to what the defendant will do, not what the

4    defendant will do and what consequences that might have.

5            As the Doe case put it, "this is the difference

6    between estimation of an offense's risk of physical injury and

7    the more cabined estimation of risk of the use of force,"

8    which Judge Brodie found distinguishes in that case 16(b) from

9    924(e)(2)(B)(ii).  And, by the way, that was an observation

10   that Judge Brodie found would apply whether she was

11   considering either an as-applied or a facial challenge.

12           So, I think there is something to the argument that

13   whether a defendant would use force is a much more precise and

14   much less vague inquiry than whether a defendant's conduct

15   will lead to harm against a victim, and this is an argument

16   that has been accepted by several courts, including Anglin,

17   2015 Westlaw 6828070 (Eastern District of Wisconsin, November

18   6th, 2015); Hunter, from the Eastern District of Virginia,

19   2015 Westlaw 6443084, October 23rd, 2015, and the Doe case.

20           And, by the way, some of the cases that I have or I

21   will cite aren't 924(c), but are either 16(b) or Bail Reform

22   Act cases, all with the same language.  I'm not going to

23   bother to point it out every time.

24           And this distinction, the difference between

25   estimating the offense's risk of use of force versus

                  Sue Ghorayeb,  Official Court Reporter

Add. 22

1    estimation of the offense's risk of physical injury, now is ––

2    it makes sense to give significant weight to that distinction.

3         The Supreme Court in <u>Johnson</u> was concerned about the

4    impossibility or the difficulty of determining how to measure

5    risk of harm based on what it called the judicially imagined

6    idealized ordinary case combined with the impossibility or

7    difficulty of determining how to know what quantum of risk of

8    harm was necessary, particularly compared to the unclear list

9    of enumerated crimes in 924(e)(2)(B)(ii).  We know that it was

10    the combination of those two things that was the problem.  We

11    know this because the Court used language to the effect that

12    those two features conspired to make the statute too vague,

13    that's at 2557, and also said one or the other might be

14    tolerable in isolation but not together.  That's at 2560.

15         And as pointed out in the <u>Dimaya</u> dissent –– and, by

16    the way, <u>Dimaya</u> is 803 F.3d 1110 (Ninth Circuit).

17         As pointed out in the <u>Dimaya</u> dissent and in the

18    <u>Lusenkop</u> case, 2015 Westlaw 5016514 (Southern District of

19    Ohio, August 25th, 2015), the Supreme Court in <u>Leocal</u>, 543

20    U.S. 1, from 2004, made it clear that the relevant language

21    required measuring only the risk of force, not the risk of

22    harm.  So, 924(c)(3)(B) is not like 924(e)(2)(B)(ii), which

23    requires measuring a different risk –– that is the risk of

24    harm, not the risk of force –– in different circumstances,

25    which is the idealized ordinary case, and against a different

Add. 23

1    rubric, which is that confusing list of enumerated crimes.

2             The Seventh Circuit case Vivas-Ceja, which is 2015

3    Westlaw 9301373, from yesterday, says that that confusing list

4    of enumerated crimes was essentially irrelevant, but it seemed

5    to me it wasn't irrelevant; it was at least a contributor, if

6    not a major contributor, to the Court's conclusion that

7    determining the quantum of risk was just too difficult in the

8    924(e) situation.

9             Another factor that to me shows that 924(c) does not

10   implicate the same exercise of imagining an idealized case and

11   assessing whether that conduct risks the consequence of injury

12   to third persons is language in 924(c) which asks about what

13   the offense is like "by its nature."  That, that section does

14   not, like 924(e), ask if the offense "otherwise involves

15   conduct" that presents a risk of physical injury.

16            The Vivas-Ceja case says that those two things are

17   the same "by its nature" and "otherwise involves," but I don't

18   agree with that.  They both may require categorical inquiry as

19   opposed to inquiry based on particular facts, but I don't

20   think that makes them synonymous, and I think that phrase "by

21   its nature" is important.

22            Under 924(c), the question is whether the offense

23   "by its nature" presents the risk that the defendant would use

24   force.  In other words, whether the offense inherently or as

25   the Second Circuit put it in Ivezaj, 568 F.3d 88, whether it

                  Sue Ghorayeb,  Official Court Reporter

Add. 24

1   intrinsically presents a risk of force, not whether it

2   ordinarily presents a risk of danger as in the Johnson case.

3          So, not only is 924(c)(3)(B) measuring the risk of

4   force, as opposed to the risk of harm to third-parties, which

5   is to me a tighter and less vague inquiry than under

6   924(e)(2)(B)(ii), but it's also not looking to the "judicially

7   imagined idealized ordinary case" that so disturbed the

8   Johnson Court.

9          The requirement that the offense "by its nature"

10  presents that risk or, as Leocal put it, that it "naturally

11  involves a person acting in disregard of the risk that

12  physical force may be used against another in committing the

13  offense," that's Leocal at 10, to me is a higher bar or a

14  tighter or less vague inquiry than if the offense "otherwise"

15  or "ordinarily" presents risk, and it's one that's

16  significantly less likely to leave anyone unsure as to its

17  applicability, and, yet, the inquiry is still categorical, as

18  required under Ivezaj.  We are not looking to how the

19  defendant is alleged to have committed the offense in the

20  individual case, we are looking to what is inherent or

21  intrinsic in the offense by its nature.

22         I note that some courts have argued that 924 -- that

23  the 924(c) inquiry shouldn't be categorical because of the

24  reasoning of the Supreme Court in the Taylor case -- which was

25  an ACCA case -- does not apply, and there is some force to

Sue Ghorayeb,  Official Court Reporter

Add. 25

1    those arguments, but the Second Circuit has said it has to be

2    categorical, and it is categorical to look at an offense by

3    its nature, because you're looking at virtually every instance

4    of the offense's commission, not a judicially imagined

5    ordinary case, and, so, I don't believe the vagueness problems

6    of Johnson are present.  See U.S. against Prickett, 2015

7    Westlaw 5884904, from the Western District of Arkansas from

8    October 8th.

9           There are other reasons to conclude that Johnson

10   would not govern here.  As I mentioned, the Johnson Court

11   pointed to, if not emphasized, the confusing list of

12   enumerated offenses in 940 —— 924(e), which is absent here, as

13   the Anglin case and the McDaniels case, which is 2015 Westlaw

14   7455539 (Eastern District of Virginia, November 23rd), also

15   noted.  And as those two cases and the Hunter case noted,

16   there have been no previous problems construing 924(c)(3)(B)

17   either in the Supreme Court or the lower courts, as there were

18   with respect to 924(e)(2)(B)(ii), as emphasized in Johnson.

19   To the contrary, the Supreme Court was nine-zip in construing

20   the relevant language in Leocal.

21          As the dissent in Dimaya noted, Johnson didn't even

22   mention Leocal, which it surely would have if it had meant to

23   cast doubt on that decision, and Johnson took pains to say

24   that it was not invalidating other statutes that measure risk,

25   which don't involve a judicially imagined ordinary case, and I

Add. 26

1    think it said somewhere -- although, I want to check -- that

2    it might even be confining its decision to the Immigration

3    Act, but I can't find that right now.

4            Anyway, if it's there, I'll be able to find it

5    later, and if it's not, never mind.

6            But bottom line, I think the question that one has

7    to ask under 924(c)(3)(B), which is, is the risk of force

8    inherent in what a defendant does to commit this crime, is it

9    a way less vague question than the question one has to ask

10   under 924(e)(2)(B)(ii), which is, what is the ordinary form of

11   this crime, and in that form, is what a defendant does to

12   commit that crime something that is likely to lead to physical

13   injury to a third person when compared to burglary, arson,

14   extortion, use of explosives.  I can see why the latter would

15   be void for vagueness, but I don't think that the former is.

16           Now, turning to the Indictment here, the question is

17   whether the RICO conspiracy charged in Count One is a crime of

18   violence.  The Second Circuit in Patino, 962 F.2d 263, I

19   think -- I'm having trouble reading my own document; yes, 263;

20   Chimurenga, 760 F.2d 400, and Doe 49 F.3d 859, all -- in all

21   those cases, the Second Circuit found that a conspiracy to

22   commit a crime of violence was a crime of violence under the

23   residual prong.

24           Ciccone, 312 F.3d 535, didn't say outright whether

25   the conspiracy in that case was found to be a crime of

                Sue Ghorayeb,  Official Court Reporter

Add. 27

27

 1    violence under the substantial risk prong as opposed to the

 2    elements prong, but it's pretty clear based on the footnotes

 3    and common sense that they were talking about the residual

 4    prong, and the Government here concedes that conspiracy to

 5    commit a crime of violence isn't a crime of violence under the

 6    force prong, just the residual prong.

 7          So, those three -- that series of cases -- Patino,

 8    Chimurenga, Doe, Ciccone -- dictate that for a conspiracy, to

 9    determine if it's a crime of violence, you look to the

10    offenses that are alleged to be objects of the conspiracy.

11    Here, the object of the conspiracy is alleged to be RICO.  For

12    RICO, in turn, you look to the predicates per the Ivezaj case.

13          So, for conspiracy to commit RICO, you look to see

14    if the object is a crime of violence by looking to see whether

15    the predicate acts of racketeering are crimes of violence, and

16    this, you know, this makes sense.  When you charge a jury on a

17    conspiracy offense, you charge it on the elements of the

18    alleged objects.  You don't just say, "well, conspiracy to

19    kidnap," you tell the jury what kidnapping consists of, and

20    the same applies here, you look at the object and its

21    elements, but you don't go beyond that to the specific

22    particulars of how the defendant is alleged to have committed

23    the offense in this case.  So, it is a categorical inquiry.

24          I don't look to the specific facts or means -- or

25    means and methods of the particular case, I just look to the

Sue Ghorayeb,  Official Court Reporter

Add. 28

1   elements and the statutory definitions of the offenses, the

2   objects and the predicates, as the Supreme Court in Descamps,

3   133 Supreme Court 2276, and the Second Circuit cases dictate.

4           I don't, as the Government urges, look to the

5   narrative in the Indictment about the purposes of the

6   conspiracy or its means and methods, I look to the pattern of

7   racketeering and what it consisted of, which is categorical.

8   See Ciccone, at 452, where the court cited U.S. against

9   Winter, 22 F.3d 15 (First Circuit 1994), where the court

10  described as categorically oriented questions, questions like

11  "racketeering by what means" and "racketeering to what end,"

12  and that is the inquiry here.  What does the pattern of

13  racketeering consist of?

14          Here, it includes murder, attempted murder, and

15  conspiracy to murder.  So, a conspiracy to conduct the affairs

16  of the enterprise through that pattern is a crime of violence

17  because it obviously presents a serious risk of the use of

18  physical force against a person, assuming a jury were to find

19  those predicates.  And I think this outcome is consistent with

20  the Circuit's observation in Chimurenga, at Page 404, that

21  Congress couldn't have intended that a defendant would avoid

22  924(c) liability by the happenstance that an arrest or

23  something else prevents the achievement of a conspiracy's

24  objectives.

25          So, I'm going to deny the motion to dismiss Count

Add. 29

1    Two.  I wouldn't fall off my chair if the Circuit agreed with

2    me or disagreed with me.  This is really a close call.

3           So, I don't know -- somebody mentioned last time

4    they hoped this ruling would, you know, give the parties some

5    certainty that they were looking for.  I don't know that it

6    gives you any certainty because I could be wrong.  But, at

7    least, unless the Second Circuit says something different

8    between now and the trial date, at least, you'll know the

9    respects in which we're going forward.

10           Any further business for this afternoon?

11           There was somebody who is going to stay behind,

12    right?

13           MR. ZOLKIND:  Your Honor, and before we get to that,

14    I think there is a motion for a Bill of Particulars.

15           THE COURT:  Ah, yes.  Yes, yes.  I do want to get to

16    the Bill of Particulars.

17           MR. ZOLKIND:  Yes.

18           THE COURT:  Thank you for reminding me.  And this --

19    what I'm about to say, you know, doesn't come so much from

20    Johnson, it's just what I've been doing in a whole series of

21    RICO cases that I've had that are similar to this one.

22           I do think the Government has to do more to

23    particularize.  I'm not -- I'm not going to require the

24    Government to commit to what its evidence is going to be about

25    every time any Defendant had a gun or had access to a gun or

Sue Ghorayeb,  Official Court Reporter

Add. 30

1    knew about a gun or had anything to do with a gun, that's

2    evidentiary detail.  But I do think the Government -- and this

3    is probably something either you've already done or were going

4    to do anyway or would do in your enterprise letter.

5           I do think the Government should tell the Defendants

6    what it expects to prove with respect to specific uses,

7    carryings, dischargings, brandishings; in other words, you

8    know, to the extent you are aware of dates.

9           If this is going to be one of those cases -- and I

10    don't know that it is -- where, you know, there are weapons

11    that are shared among the group and everybody knows about

12    them, and, you know, people have been seen with them but you

13    don't know when, obviously, you can't really particularize

14    that.  But to the extent you are aware of specific occasions

15    where the gun was in somebody's hand, you need to tell the

16    other side about it.

17           MR. ZOLKIND:  Your Honor, we will certainly do that.

18    And I think, as the Court alluded to, we are preparing an

19    enterprise letter, which is due I believe on January 22nd, and

20    that will certainly, in addition to the conversations that

21    we've had and we're happy to have, that letter will certainly

22    particularize, to the extent that we can, all of those facts.

23           THE COURT:  Yes.  I don't think the defense, as I

24    said, is entitled to know, for example, what a cooperator is

25    going to say about what he and she -- he or she saw on the

Add. 31

1  street on a daily basis, but I do think it's reasonable to

2  require you, to the extent you know, as I said, about specific

3  occasions where a Defendant had a gun in hand or where a

4  Defendant was involved in some activity with a co-defendant

5  who has a gun -- who had a gun in hand.

6          For instance, if A and B go to commit a robbery and

7  the gun is in A's hand, I think you need to tell B about it

8  too -- I guess I shouldn't say co-defendant, I should say

9  co-conspirator -- if for no other reason than it will enable

10  Defendants to prepare better, to evaluate their circumstances

11  better, and will avoid unnecessary requests for continuances

12  during the trial.

13          MR. HARTMAN:  Judge, if I can just say one thing

14  about that.  I know we've addressed this at some prior

15  conferences, but what we have done -- we've done that in a

16  number of different ways:

17          One of the ways we've done that is with respect to

18  the discovery that's been produced.  When we produced the

19  discovery, we identified for the Defendants the discrete acts

20  of violence that we intend to prove at the trial.  I think

21  there were something like 22 of them, and we gave them dates,

22  we gave them who we felt the participants would be, we gave

23  them redacted versions of the police reports, and we also gave

24  them, to the extent there was video or any other discovery-

25  type information that would be associated with those

Sue Ghorayeb,  Official Court Reporter

Add. 32

1    incidents, we gave that to them as well.

2            We have also given them, to any Defendant who has

3    asked for it, a proffer of what we would expect the cooperator

4    testimony to be with respect to the key acts of violence that

5    we would expect to prove at the trial.  And in a generalized

6    matter, we have also told them -- in a generalized manner, we

7    have also told them, you know, we have a cooperator who would

8    say he saw your client selling this number of times or

9    carrying guns on this number of occasions.

10           So, we think we've done that already.  Our, our

11   enterprise letter will I think further solidify that, but we

12   do think we have given them a lot of different ways to get at

13   this information already.

14           THE COURT:  All right.  Well, I expect that there

15   won't be any surprises at trial then.

16           MR. DeVITA:  Your Honor, if I may, I think that it

17   will be helpful, in fact important, for the Government to

18   memorialize that in something along the lines of a Bill of

19   Particulars, because a Bill of Particulars serves more than

20   one purpose.  It includes locking the Government in as to what

21   its actual contentions are in a way that if at a trial

22   something else pops up, it's not inquired into and different,

23   the Defendant doesn't get surprised by that.  And, Number 2,

24   that it enables a Defendant for double jeopardy purposes to

25   identify what it was that the Government was contending

                    Sue Ghorayeb,  Official Court Reporter

Add. 33

1    constituted the crime.

2            So, I think that — and all of what Mr., what Mr.

3    Hartman just said is accurate in terms of being helpful to

4    share the information, but I think that from the pleading

5    standpoint a Bill of Particulars serves a different function

6    and I think that that's important that it be put in paper —

7    put on paper.

8            THE COURT:  Well, doesn't the locking in aspect of

9    the Bill of Particulars cut both ways?

10           Because if they've given you more than they are

11   entitled to, I don't want to — if they're giving you more

12   than you are entitled to, I don't want to lock them in.  So,

13   if they're going out of their way to say, "we have cooperators

14   who will say X, Y and Z," which they absolutely don't have to

15   give you —

16           MR. DeVITA:  No.  I understand that, Judge.

17           THE COURT:  — you know, I don't think they should

18   have to put it in a form that you'll later wave around saying,

19   you know, you were misled or —

20           MR. DeVITA:  Well, Your Honor, I think —

21           THE COURT:  And it sounds like they are going to put

22   it in writing anyway.

23           MR. DeVITA:  Well, I'm not asking them to put the

24   evidence into a writing.  What I'm saying is that a Bill of

25   Particulars is a form of pleading.  It serves a different

                   Sue Ghorayeb,  Official Court Reporter

Add. 34

1   function than discovery.  I mean, I've seen the Government

2   say, "you can't use a Bill of Particulars for discovery."

3           We are using the Indictment for discovery here, but

4   it's a form of pleading that enables the subsequent analysis

5   of what in fact is probably in the Indictment with more

6   particularity, and I think that's fair.

7           THE COURT:  Well, I think as to the specific acts of

8   violence that they intend to prove up, those should be

9   specified in writing, if they aren't, if they weren't already.

10          MR. DeVITA:  And also the uses of weapons, Your

11  Honor, because that's -- when you have, in addition --

12  particularly when you have an eight-year -- I'm sorry.  I

13  think it's a 2008 to 2014 conspiracy charge and you have a

14  single 924(c) count, it's kind of alleged twice.

15          THE COURT:  Well, I think, I think I differ from you

16  there, because if the evidence is going to be, "hey, we all

17  had a gun, we stashed it under the stoop, everybody knew where

18  it was," they can't particularize that.  I mean I don't know.

19          You know, like I said, if, if the gun is used, you

20  know, to rob a drug dealer or to threaten somebody, that's an

21  act of violence and they have to particularize it, but I don't

22  think they have to particularize every use of a gun.  That

23  would --

24          MR. DeVITA:  As to a particular Defendant, Your

25  Honor.  If you have a defendant, for example, who -- and I'm

Sue Ghorayeb,  Official Court Reporter

Add. 35

```
 1    talking theoretically here.  But a defendant who joins a
 2    conspiracy in 2011 and you have a gun that was hidden under a
 3    porch in 2008, to say that that defendant is responsible for
 4    that gun because he was part of the conspiracy that continued
 5    for the six-year period is unfair, and I think that the --
 6    what, what the Government can do is identify as to the 924(c)
 7    count, which gun it is that each Defendant is charged with.
 8            THE COURT:  Well, as a practical matter, I've never
 9    seen a case where that's even feasible.  You know how these
10    work.  Cooperators say, "yeah, you know, we had a gun here and
11    there."
12            I mean, I'm going to charge the jury as to, you
13    know, liability for acts of co-conspirators, and the jury
14    can't hold somebody who joined the conspiracy in 2011
15    responsible for a gun that was there in 2009 unless, you
16    know -- I forget exactly how it's phrased, but it has to be --
17    you know, a co-conspirator is responsible for what went on
18    before he joined to the extent he is aware of it and it's
19    within the scope of what he agreed to.  So, if he wasn't aware
20    of it and it wasn't within the scope of what he agreed to, and
21    the Government can't prove when it was, then they're not going
22    to convict -- they shouldn't be able to convict on that as to
23    that latecomer.  But, you know, to the extent they know of a
24    particular gun, you know, maybe there is a particular -- I
25    think we're not that far off.  To the extent there are
```

Sue Ghorayeb,  Official Court Reporter

Add. 36

1  particular guns that they are attributing to particular

2  Defendants, they are going to tell you --

3         MR. DeVITA:  And Your Honor --

4         THE COURT:  -- or specific acts that there are --

5  specific guns or specific acts, and if they know when, they'll

6  say when, but if what they have is a cooperator who says, "oh,

7  you know, sometime, you know, before so and so went off to

8  jail, I saw him threaten somebody else with a gun," they don't

9  know exactly when that was.

10        MR. DeVITA:  But, Your Honor, I guess what I'm --

11  what I am to understand is, is when the Government is going to

12  do that, and is that, is that part -- they're saying -- it

13  sounded to me like Mr. Hartman was saying it's going to be

14  part of the enterprise letter.  I thought Your Honor was

15  saying do something sooner.

16        THE COURT:  No, I don't think I said sooner.  I mean

17  the enterprise letter is due in four weeks, that's six weeks

18  before trial.  They are representing to me that they've given

19  you all of this information informally.  So, I'm not going to

20  require them to do it sooner.

21        Anything else we should do now apart from whoever is

22  staying behind?

23        MR. ZOLKIND:  Nothing from the Government.  Thank

24  you, Your Honor.

25        THE COURT:  All right.  I don't remember offhand

Sue Ghorayeb,  Official Court Reporter

Add. 37

1    when we're getting together.  I don't think it's until after

2    motions in limine.

3              MR. ZOLKIND:  That's right, Your Honor.

4              THE COURT:  So, it will be March 2nd.

5              MR. ZOLKIND:  That's what I have.

6              THE COURT:  All right.  Well, maybe I'll see some of

7    you before then, but if not, I'll see you on March 2nd.

8              (Case adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sue Ghorayeb,  Official Court Reporter